THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALAN KAYE, Defendant-Appellant.

First District (1st Division)   No. 85—1816

Opinion filed March 9, 1987.—Rehearing denied April 30, 1987.

Louis B. Garippo, Ltd., of Chicago (Louis B. Garippo and Susan G. Feibus, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial, defendant, Alan Kaye, a Cook County deputy sheriff, was convicted of six counts of bribery, three counts of theft by deception, and one count of intimidation (Ill. Rev. Stat. 1985, ch. 38, pars. 33—1(d), (e), 16—1(b)(1), 12—6) and sentenced to concurrent terms of imprisonment for five years, four years, and four years, respectively. On appeal, defendant contends that: (1) pursuant to the statutory prohibition against double jeopardy, the State court prosecution for intimidation was barred by defendant's former prosecution in Federal court for Hobbs Act extortion; (2) pursuant to the doctrine of collateral estoppel, the State court prosecution for bribery was barred by defendant's prior acquittal in Federal court of the offense of mail fraud; (3) the trial court erred in convicting defendant of theft by deception when the evidence failed to establish the completed offense of theft or the element of deception; and (4) multiple convictions for bribery, theft by deception, and intimidation are improper because all offenses arose from the same conduct. For the reasons that follow, we affirm the judgment of the circuit court as to three of the six counts of bribery, all counts of theft by deception and the single count of intimidation; vacate three counts of bribery; and remand for resentencing for the bribery conviction only.

The record sets forth the following facts pertinent to this appeal. The Federal and State court indictments against defendant stemmed from his purported involvement in the divorce proceedings of Iris and Leo Zutler. At trial, Leo testified that when he initially met defendant in late 1980 or early 1981, he complained to defendant about the length of time it was taking to get his divorce finalized. Defendant told Leo that he knew the judge who was handling his divorce and it would take $5,000 to move the case forward. Leo gave the money to defendant in early 1981. Defendant then led Leo to believe that he had spoken to the judge and that the divorce would be expedited. Although the divorce hearing was held several weeks later, there is no evidence that the judge ever received the money, or that he had been contacted.

On April 28, 1981, an order was entered dissolving the Zutler

marriage. Objections were filed to the order and the April 28 order was vacated and the proceeding reassigned. Shortly thereafter, the Zutlers reconciled. In July 1981, Leo contacted the FBI and told them about the $5,000 payment he had made to defendant to expedite the divorce proceeding. Leo agreed to wear a body recorder to tape all future conversations with defendant.

In September 1981, Iris Zutler's divorce attorney filed a petition for attorney fees, requesting $37,000. Leo objected to the amount of the fees and the matter was assigned to the court call for a hearing. Prior to the hearing, defendant told Leo that to get a reduction in the amount of fees awarded, Leo would have to pay one-half of whatever amount he gave to the judge ruling on the fee petition. Leo agreed on the condition that there be a $5,000 ceiling on the amount he would have to pay the judge. There is no evidence that any judge was actually involved. Following the hearing, the attorney fees were reduced to $15,000, resulting in a savings to Leo of $22,000.

On November 11, 1981, Leo met with defendant at a restaurant. Although Leo was supposed to have the $5,000 payment, he did not. Defendant warned Leo that he worked for John D'Arco, alleged boss of the crime syndicate, and that if Leo did not pay defendant, D'Arco would want "something nasty done" to him. When Leo expressed concern about how he would get the money, defendant stated:

"These guys, they don't care if you're dying and ya don't have a quarter and you'll go rob a *** bank as far as they're concerned.

They want their end and they don't care nothin about nothin."

Leo agreed to meet with defendant the next day.

On November 12, 1981, defendant met with Leo at Leo's office. When Leo told defendant that he had only $1,000 of the $5,000 he owed, defendant said it was "nothin," and that he wanted the entire amount. Defendant threatened Leo with physical harm, adding that if he was "gonna be in a juice situation where you're gonna pay every week," the price would be $11,000 rather than $5,000. When Leo claimed that was the best he could do, defendant left, allegedly to find out if partial payments would be acceptable to his superior. When he returned, defendant told Leo that he either had to pay $5,000 in one lump sum or pay $1,000 per week for 11 weeks. Leo agreed to pay the $1,000 per week to the best of his ability.

On November 19, 1981, defendant again met Leo at his office and collected his $1,000 payment in $100 bills. On December 3, 1981, they met again at Leo's office. This time, Ron Elder, undercover FBI

agent, was also present. Elder posed as a wealthy businessman seeking a divorce. When defendant demanded the two payments then due from Leo, Leo told him that he did not have it. At that point, defendant again threatened Leo, warning him that if he did not pay the money, his building might be burned down. Elder then offered to loan Leo the necessary $2,000. Leo agreed and signed a promissory note, witnessed by defendant.

On December 10, 1981, defendant again met Leo and Elder at Leo's office to collect the next $1,000 payment. Before defendant arrived, Leo called John D'Arco and told him that defendant was bleeding him dry. Leo knew D'Arco personally as the result of having done some favors for him in the past. D'Arco told Leo that defendant did not work for him. When Leo told defendant that he had called D'Arco directly, defendant denied having implicated D'Arco and told Leo that the phone call had caused some serious problems. Leo then told defendant that D'Arco would stand by him if pressure were put on him to pay an additional $6,000 and that that night's $1,000 payment was going to be the last. Once again, Elder loaned $1,000 to Leo for the payment, and Leo signed another promissory note, witnessed by defendant.

As a result of the above transactions, corroborated by tape recordings, defendant was charged in a Federal indictment with mail fraud and multiple violations of the Hobbs Act (18 U.S.C. sec. 1951 (1984)), i.e., extortion affecting interstate commerce. Subsequently, on August 23, 1984, defendant was acquitted of the Federal charges. Regarding mail fraud, the district court found that because there was no evidence that the judiciary was actually involved in the payoffs, the government had failed to prove the specific scheme to defraud that had been alleged in the indictment, i.e., public deprivation of the right to an honest court system. In addition, the district court found that there was insufficient evidence to prove that defendant had been engaged in a scheme to conduct the business of the State court in a corrupt manner. With respect to the Hobbs Act charges, the district court found that the government had failed to establish that the alleged acts had had either an actual effect or an attempted effect on interstate commerce.

Following his Federal acquittal, defendant was indicted in State court for official misconduct, theft by threat, bribery, theft by deception, and intimidation, predicated on the same acts which gave rise to the Federal charges. The trial court found defendant not guilty of the charges of official misconduct and theft by threat, and found him guilty of six counts of bribery, three counts of theft by deception, and

one count of intimidation. Following the sentencing hearing, with arguments in aggravation and mitigation, the court sentenced defendant to concurrent terms of five years for bribery, four years for theft by deception, and four years for intimidation. Defendant's post-trial motion was denied and he was released on appeal bond. This appeal followed.

■■ Initially, defendant contends that, pursuant to the statutory prohibition against double jeopardy set forth in section 3—4(c)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 3—4(c)(1)), the State court prosecution for the charge of intimidation was barred by the former Federal court prosecution for Hobbs Act extortion. Section 3—4(c)(1) states, in pertinent part:

"(c) A prosecution is barred if the defendant was formerly prosecuted in a District Court of the United States or in a sister State for an offense which is within the concurrent jurisdiction of this State, if such former prosecution:

(1) Resulted in either a conviction or an acquittal, and the subsequent prosecution is for the same conduct, unless each prosecution requires proof of a fact not required in the other prosecution, ***."

Predicated on section 3—4(c)(1), defendant argues that: (1) there is concurrent jurisdiction; (2) the facts necessary to establish the elements of the two offenses are the same; and (3) the trial court erred in analyzing the two offenses in terms of their elements rather than the facts necessary to prove the elements.

Prior to our analysis of the elements necessary to prove each offense, we first address two preliminary arguments raised by the State. First, the State argues that, pursuant to section 114—1(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 114—1(b)), defendant has waived the double jeopardy argument by his failure to raise the issue prior to trial. Section 114—1(b) provides that a written motion for dismissal based on double jeopardy must be "filed within a reasonable time after the defendant has been arraigned. Any motion not filed within such time or an extension thereof shall not be considered by the court and the grounds therefor *** are waived." Second, the State argues that the State and Federal courts did not have concurrent jurisdiction over the Hobbs Act claim. Thus, the prerequisite to the statutory prohibition against double jeopardy is not satisfied.

With respect to the waiver claim, defendant admits that he did not raise the double jeopardy issue prior to trial. However, he contends that his failure to do so was by agreement with the State to ex-

pedite the proceedings. In ruling on this issue, the trial court found ample evidence existed to substantiate defendant's position and concluded that the State's earlier agreement with defendant estopped the State from raising the waiver rule as a defense. Our review of the record confirms the trial court's finding of estoppel.

■■ Regarding the concurrent jurisdiction argument, it is well established that unless a Federal statute expressly or impliedly grants exclusive jurisdiction to the Federal courts, State courts have concurrent jurisdiction over claims predicated on that statute. (*Reidelberger v. Bi-State Development Agency* (1956), 8 Ill. 2d 121, 133 N.E.2d 272; *Parkin v. Damen-Ridge Apartments, Inc.* (1951), 344 Ill. App. 301, 100 N.E.2d 632.) Accordingly, because the Hobbs Act does not confer exclusive jurisdiction upon the Federal courts, we concur with the trial court that it had concurrent jurisdiction.

■■■ We next address defendant's contention that the facts necessary to establish the elements of Hobbs Act extortion and the offense of intimidation are the same and, thus, pursuant to section 3—4(c)(1), prosecution of the former bars prosecution of the latter. Section 3—4(c)(1) is a codification of the test for double jeopardy enunciated by the United States Supreme Court in *Blockburger v. United States* (1932), 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180:

"[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. 299, 304, 76 L. Ed. 306, 309, 52 S. Ct. 180, 182.

Subsequently, in *Illinois v. Vitale* (1980), 447 U.S. 410, 65 L. Ed. 2d 228, 100 S. Ct. 2260, the Supreme Court further explained that the *Blockburger* test focuses on the statutory elements of each offense, rather than on the actual evidence presented at trial. Thus, if the statutory elements of one offense require an element of proof which the other offense does not include, then for purposes of double jeopardy, the offenses are not the same. (*People v. Patete* (1980), 91 Ill. App. 3d 655, 419 N.E.2d 921.) Contrary to defendant's contention, the phrase "proof of a fact" as it appears in section 3—4(c)(1) refers to the elements of the offenses, not to the underlying conduct giving rise to the charges. *Blockburger v. United States* (1932), 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180.

In the present case, proof of Hobbs Act extortion requires that the following elements be satisfied: (1) interference with commerce by robbery or extortion or attempt to do either; or (2) actual or threatened physical violence in furtherance of a plan to interfere with inter-

state commerce. (18 U.S.C. sec. 1951 (1984).) By contrast, proof of the offense of intimidation requires proof of: (1) intent to cause another to perform or to omit the performance of any act; and (2) communication of a threat to do certain enumerated acts without authority. Ill. Rev. Stat. 1985, ch. 38, par. 12—6.

The parties concur that a conviction of Hobbs Act extortion requires proof that defendant interfered with interstate commerce, while the offense of intimidation does not. However, the inquiry with respect to double jeopardy does not stop here. Each offense must require proof of an element the other does not. Thus, the offense of intimidation must also require an element distinct from Hobbs Act extortion.

■ The State argues that the offense of intimidation requires proof of specific intent, while the Hobbs Act does not. In response, defendant argues that although an actual effect on interstate commerce is a general intent crime, an attempt to affect commerce is a specific intent crime. Defendant further argues that because the money used in the payoffs was FBI money used for investigative purposes, he can be charged only with the inchoate offense of attempt. (*United States v. Rindone* (7th Cir. 1980), 631 F.2d 491.) Thus, defendant concludes, the Hobbs Act, as it applies to him, is a specific intent crime. We find defendant's argument unpersuasive in light of existing Federal law which has consistently held that the Hobbs Act is a general intent statute. (See *United States v. Furey* (E.D. Pa. 1980), 491 F. Supp. 1048, *aff'd* (1980), 636 F.2d 1211.) Accordingly, we conclude that the offense of Hobbs Act extortion and the offense of intimidation each requires proof of an additional element which the other does not, thereby rendering inapplicable the statutory prohibition against double jeopardy.

■ Next, defendant argues that his acquittal of the Federal offense of mail fraud bars the State prosecution for bribery pursuant to the Federal constitutional prohibition against double jeopardy and pursuant to section 3—4(c)(2), which codified the common law concept of collateral estoppel. Regarding the constitutional argument, we find *Bartkus v. Illinois* (1959), 359 U.S. 121, 3 L. Ed. 2d 684, 79 S. Ct. 676, dispositive of the issue. In *Bartkus*, the Supreme Court held that successive State and Federal prosecutions based on the same acts do not violate the double jeopardy clause of the fifth amendment.

With respect to the statutory argument, section 3—4(c)(2) provides that if the former Federal prosecution "required a determination inconsistent with any fact necessary to a conviction" of the State prosecution, the State prosecution is barred. In the present case, ac-

quittal of the Federal charge for mail fraud was predicated on the Federal court's determination that: (1) defendant was not a public official in a fiduciary position; and (2) interference with the court system could not be established because no evidence had been presented as to the judiciary's involvement in the payoff scheme.

In order to establish the offense of bribery, the State must prove that defendant:

> "(d) *** receive[d], retain[ed] or agree[d] to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or
>
> (e) *** solicit[ed], receive[d], retain[ed], or agree[d] to accept any property or personal advantage pursuant to an understanding that he shall improperly influence or attempt to influence the performance of any act related to the employment or function of any police officer, public employee, juror or witness." Ill. Rev. Stat. 1985, ch. 38, pars. 33—1(d), (e).

Defendant claims that because the State's bribery indictment refers to him as a "public official," the Federal court's determination that he was not acting in his capacity as a public official is a fact inconsistent with the facts necessary to establish the offense of bribery. We disagree. The bribery statute does not require proof that defendant had acted in the capacity of a public official. Thus, a prior determination that defendant was not acting in that capacity is not a determination inconsistent with any fact necessary for a conviction of bribery. Further, because section 3—4(c)(2) refers specifically to necessary elements of the offense, and not to surplusage[1] in the indictment, we find that reference to defendant as a "public official" in the indictment is irrelevant to the issue of collateral estoppel.

Defendant further contends that inclusion of the reference "public official" in the indictment acted to misdirect the thrust of his defense which was geared toward collateral estoppel. Based upon the facts in this case, we are not persuaded that defendant was not sufficiently informed as to the nature of the charge so as to prepare his defense. As further evidence that reference to defendant as a "public official" was

---

[1]In *People v. Moore* (1938), 368 Ill. 455, 457-58, 14 N.E.2d 494, the Illinois Supreme Court defined "surplusage" in an indictment as information which could be stricken out without vitiating the indictment by failing to inform defendant of the nature of the charge.

merely surplusage, there was never a contention that Leo was giving money to defendant to influence defendant's conduct in his capacity as a public official. Instead, defendant was presumed to be merely a conduit to the judiciary, a presumption that defendant consistently encouraged in the taped conversations. Accordingly, we conclude that defendant's acquittal for the Federal offense of mail fraud does not act to collaterally estop his conviction for bribery.

■ Next, defendant contends that the evidence failed to establish the completed offense of theft or the element of deception, requisite elements to the offense of theft by deception. In Illinois, a "person commits theft when he knowingly *** (b) [o]btains by deception control over property of the owner; *** and (1) [i]ntends to deprive the owner permanently of the use or benefit of the property ***." (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(b)(1).) "Owner" is defined as "a person, other than the offender, who has possession of or any other interest in the property involved, even though such interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property." Ill. Rev. Stat. 1985, ch. 38, par. 15—2.

Regarding the completed offense of theft, defendant asserts that because the money paid by Leo to defendant was supplied by the FBI and was not Leo's own money, Leo was not the "owner" of the property within the statutory definition of the offense. In our view, defendant's argument is defeated by the statutory definition of "owner," which defines an owner as one who has an "interest in the property involved." Leo's interest in the money supplied by the FBI is clear in light of defendant's threats to him if he should fail to pay. Leo also had a further interest in the money in his capacity as middleman for the FBI. Further, we find defendant's analogies to an attempted effect on interstate commerce under the Hobbs Act and an attempt to receive retrieved stolen goods unpersuasive. As a result, we conclude that sufficient evidence was introduced to establish the completed offense of theft.

With respect to the element of deception, defendant asserts that his conviction for theft by deception cannot stand because the State failed to sustain its burden of proving that Leo had relied upon defendant's representations and that this reliance induced Leo to pay defendant. As support for his position, defendant contends that Leo's comments to D'Arco on December 10 that he thought defendant was pocketing some of the money indicated that Leo was not relying on defendant's statements that the payments would be used to bribe the judiciary.

■ We concur with defendant that the offense of theft by deception requires reliance by the victim on the defendant's deceptive conduct. (*People v. Davis* (1986), 112 Ill. 2d 55, 491 N.E.2d 1153.) However, we disagree that the facts fail to establish Leo's reliance on defendant's deceptive representations. Although Leo's conversation with D'Arco may have allayed Leo's fear of physical harm, the evidence clearly establishes that both Leo and the FBI believed that defendant was using at least part of the money to fix cases. Whether he had also pocketed some of the money for himself is irrelevant to the conviction.

■ Finally, defendant contends that conviction for bribery, theft by deception, and intimidation was improper on the grounds that all arose from the same course of conduct which culminated in defendant's receiving from Leo money supplied by the FBI in connection with promises to influence the judiciary. In support of his position, defendant relies on *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, in which the court stated:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. *** 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. *** [W]hen more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." 66 Ill. 2d 551, 566, 363 N.E.2d 838.

In response, the State argues that the offenses arose from separate and distinct acts, and all required proof of different statutory elements. Specifically, the State distinguishes the acts upon which the bribery conviction (three counts for receiving money, three counts for solicitation) is based from those upon which theft by deception is based on the fact that defendant could not actually influence the outcome of court cases.

As previously stated, *King* defines "act" as "an overt or outward manifestation," *i.e.*, a "physical act." In the case at bar, defendant's act of receiving money from Leo is the physical act upon which both theft by deception and the three bribery counts based upon receiving money (Ill. Rev. Stat. 1985, ch. 33, par. 33—1(d)) are predicated. Defendant's ability to actually influence the judiciary is not the physical act upon which theft by deception is based. Instead, the overt act is defendant's actual receipt of money from Leo. Accordingly, we find that the trial court erred in convicting defendant

of both theft by deception and three counts of bribery predicated on receiving money (Ill. Rev. Stat. 1985, ch. 38, par. 33—1(d)). Our decision, however, does not affect the remaining three bribery counts predicated on defendant's solicitation of money (Ill. Rev. Stat. 1985, ch. 38, par. 33—1(e)). In our view, the act of soliciting preceded the act of receiving and is distinguishable. Accordingly, we afrirm defendant's conviction for three counts of bribery predicated on solicitation (Ill. Rev. Stat. 1985, ch. 38, par. 33—1(e)), and vacate the counts for bribery predicated on receiving money. (Ill. Rev. Stat. 1985, ch. 38, par. 33—1(d)). Further, because we cannot be certain that the total number of bribery counts did not impact on the trial court's sentencing determination for the bribery conviction, we remand this cause to the trial court for resentencing as to the three remaining counts of bribery. (*People v. Walton* (1981), 94 Ill. App. 3d 903, 419 N.E.2d 495.) With respect to defendant's conviction for intimidation, we find that the overt acts upon which this offense is predicated are separate from those acts which support the other convictions and, consequently, affirm the conviction for intimidation.

Based upon the aforementioned, the judgment of the circuit court is affirmed as to three counts of bribery predicated on solicitation (Ill. Rev. Stat. 1985, ch. 38, par. 33—1(e)), three counts of theft by deception, and one count of intimidation; vacated as to three counts of bribery predicated on receiving money (Ill. Rev. Stat. 1985, ch. 38, par. 33—1(d)); and remanded for resentencing for the bribery conviction only.

Affirmed in part; vacated in part; and remanded for resentencing for the bribery conviction.

O'CONNOR and BUCKLEY, JJ., concur.